UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LUIS A. VALADEZ,

        Plaintiff,

v.                                                              Case No. 6:22-cv-149-MAP

COMMISSIONER OF SOCIAL SECURITY

        Defendant.

_____/

## **ORDER**

Plaintiff seeks judicial review of the denial of his claims for a period of disability and disability insurance benefits (DIB). Plaintiff argues that the Administrative Law Judge (ALJ) committed reversible error by failing to properly consider the medical opinions when articulating his RFC, and by failing to properly evaluate his subjective complaints. As the ALJ's decision was not based on substantial evidence, the Commissioner's decision is remanded.

### *I.      Background*

Plaintiff, who was born in 1981, claimed disability beginning April 14, 2015 (Tr. 380). He was 34 years old on the alleged onset date (Tr. 171). Plaintiff earned a medical assistant associate degree (Tr. 94). He has no past relevant work but held jobs as a medical assistant; a restaurant manager; a bank teller; and a bookkeeper/ head bookkeeper (Tr. 49-55). Plaintiff reports a history of developmental delays (he did not speak until age 6) and difficulty with social understanding (Tr. 604). In 2012, Plaintiff

was involved in a motor vehicle accident that resulted in a traumatic brain injury. At the site, CPR was required to bring Plaintiff back to life (Tr. 629). Since then, Plaintiff developed mood swings, memory loss, heightened sense of perception, fatigue, proprioception impairment, headaches, and depression (Tr. 628-29). Plaintiff alleged disability due to a herniated disc, headaches, anxiety, bipolar disorder, panic attacks, and post-traumatic stress disorder (Tr. 172).

At the time of his administrative hearing, November 10, 2020 (several years after Plaintiff's DLI), Plaintiff admitted that his seizures had stabilized and were generally controlled with treatment (Tr. 56). However, he testified that he cannot work because he cannot multi-task, gets overwhelmed easily, and bites himself and pulls out his hair during stressful situations (Tr. 56). Plaintiff testified that he cannot be left alone to manage independently and that if left alone he would freeze, be in tears, close his ears, and rock back and forth (Tr. 56). At the time of the administrative hearing, Plaintiff lived in a rental home with his husband and his sister (Tr. 48).

Given his alleged disability, Plaintiff filed an application for a period of disability and DIB (Tr. 380-381). The Social Security Administration (SSA) denied Plaintiff's claims both initially and upon reconsideration (Tr. 171-188, 190-208). Plaintiff then requested an administrative hearing (Tr. 250-251). Per Plaintiff's request, the ALJ held a hearing on January 17, 2019, at which Plaintiff appeared and testified (Tr. 90-131). Following the hearing, the ALJ issued an unfavorable decision on April 30, 2019, finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits (Tr. 210-224). Upon request, the Appeals Council reviewed the

ALJ's decision and issued an Order remanding the case to the ALJ. In particular, the

Appeals Council explained:

> The residual functional capacity (RFC) assessment (Finding 5) is not supported by substantial evidence.  The decision finds the claimant has moderate limitations in the four broad functional areas (20 CFR 404.1520a(c)(3)) of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself (Decision, pages 4-5).  These findings are consistent with the assessments provided by the State agency psychological consultants (Exhibit B4A, pages 8-9; Exhibit 6A, pages 10-11) and the decision assigned the State agency opinions the "greatest weight" (Decision, page 8).  Consistent with those opinions, the RFC limits the claimant to "short, simple work instructions" and "occasional interactions with coworkers and the public."  However, the State agency psychological consultants also concluded, "Timed work or work requiring quotas would not be suitable for him" (Exhibit B4A, page 14; Exhibit B6A, page 16).  This is directly relevant to the claimant's ability to concentrate, persist, or maintain pace, yet the decision is silent regarding these restrictions, despite finding the claimant has moderate limitations in this functional area.  Accordingly, further consideration of the RFC is warranted (20 CFR 404.1545 and Social Security Rulings 96-8p and 85-16).

(Tr. 231).  The Appeals Council further instructed that, upon remand, the

Administrative Law Judge will:

> Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 85-16 and 96-8p).

(Tr. 231).

Thereafter, Plaintiff appeared before the ALJ for a hearing on November 10,

2020 (Tr. 38-89).  The ALJ issued a decision on January 26, 2021 (Tr. 16-26).  In

rendering the administrative decision, the ALJ concluded that Plaintiff met the insured

status requirements through March 31, 2017, and had not engaged in substantial

gainful activity during the period from his alleged onset date of April 14, 2015, through his date last insured, March 31, 2017 (Tr. 18).  After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments through the date last insured:  degenerative disc disease of the cervical spine, seizures, major depressive disorder with psychosis, Asperger's disorder, mood disorder, and personality disorder (Tr. 18).[1]  Notwithstanding the noted severe impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 18).  The ALJ then concluded that Plaintiff retained a residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b) with the following limitations:

> … he is limited to frequently balance, stoop, kneel, crouch, crawl, and climbing of ramps and stairs, but never climb ladders or scaffolds.  He is further limited to no more than occasional exposure to unprotected heights and dangerous equipment.  In addition, the claimant is limited to understanding, remembering, and carrying out simple and routine tasks, with few, if any, workplace changes, and with no more than occasional interaction with the public, coworkers, and supervisors.

(Tr. 20).  In formulating Plaintiff's RFC, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the

---

[1] Asperger's is a previously used diagnosis on the autism spectrum.  In 2013, it became part of one umbrella diagnosis of autism spectrum disorder (ASD) in the Diagnostic and Statistical Manual of Mental Disorders 5 (DSM-5), a manual used by clinicians and researchers to diagnose and classify mental disorders published by the American Psychiatric Association. *See* psychiatry.org-DSM (2013).

objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and SSR 16-3p (Tr. 20).

The ALJ opined that transferability of job skills was not an issue because Plaintiff does not have any past relevant work. Given Plaintiff's background, and the RFC, the vocational expert (VE) testified that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as the jobs of Office Helper (DOT 239.567-010), Packer (DOT 920.687-018), and Cleaner (DOT 323.687-014) (Tr. 27-28). Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled (Tr. 29). Given the ALJ's finding, Plaintiff requested review from the Appeals Council, which the Appeals Council denied (Tr. 1-6). Plaintiff then timely filed a complaint with this Court (Doc. 1). The case is now ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3).

II.    *Standard of Review*

To be entitled to benefits, a claimant must be disabled, meaning he or she must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

To regularize the adjudicative process, the SSA promulgated the detailed regulations currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a). Under this process, the ALJ must determine, in sequence, the following: whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404 Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4). If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of his or her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 404.1520(g)(1).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted). While the court reviews

the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citations omitted).

In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its own judgment for that of the Commissioner, even if it finds that the evidence preponderates against the Commissioner's decision. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014); *Winschel*, 631 F.3d at 1178 (citations omitted); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Ingram*, 496 F.3d at 1260 (citation omitted). The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (*per curiam*) (citations omitted).

### III. Discussion

Plaintiff argues that the ALJ erred by failing to properly consider certain medical opinions when articulating his RFC, and by failing to properly evaluate his subjective complaints. For the reasons set forth below, remand is required.

#### A. ALJ's RFC assessment

A claimant's RFC is the most work he can do despite any limitations caused by his impairments. 20 C.F.R. § 404.1545(a)(1). In formulating a claimant's RFC, the

ALJ must consider all impairments and the extent to which the impairments are consistent with medical evidence. 20 C.F.R. § 404.1545(a)(2). This includes both severe and non-severe impairments when determining if the claimant can "meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Ultimately, under the statutory and regulatory scheme, a claimant's RFC is a formulation reserved for the ALJ, who must support her findings with substantial evidence. *See* 20 C.F.R. § 404.1546(c).

In assessing whether a claimant can—despite any physical or mental impairments—obtain and perform any work that exists in substantial numbers in the national economy, the ALJ must give special attention to the opinions of a claimant's treating physician. *Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094 (11th Cir. Aug. 12, 2021). The SSA regulations applicable when Plaintiff filed his application required an ALJ to give "controlling weight" to a treating physician's opinions if they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence in [the] case record."[2] *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Eleventh Circuit case law applicable to Plaintiff's claim dictates that a treating physician's opinion must be given substantial or considerable weight unless good cause is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436,

---

[2] Although the Commissioner revised the rules regarding evaluating medical evidence on January 18, 2017, the revisions became effective March 27, 2017, and they only apply to applications filed on or after that date. *See* 20 C.F.R. 404.1520c. Because Plaintiff filed his claim for benefits before March 27, 2017, the rules in § 404.1527 govern.

1440 (11th Cir. 1997).[3]  Good cause for disregarding such opinions "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citation omitted).

The administrative record here contains extensive treatment notes from Plaintiff's neurologist, Dr. Gary Weiss, who began treating Plaintiff for headache complaints in February 2014, prior to the onset date, and treated him approximately every three months through the DLI, March 31, 2017.  Dr. Weiss diagnosed Plaintiff with multiple types of headaches triggered by neck spasms, tension, stress headaches, daily headaches originating in the right temporal and parietal region, and headaches triggered by seizures, and throughout his lengthy treatment he described Plaintiff's headache symptoms such as nausea, photo and phono sensitivity, dizziness, and head pain.

Dr. Weiss's office visit note from September 18, 2014, indicates Plaintiff had not had any recent seizures but had cluster headaches with blurred vision 4-5 times a week (Tr. 599).  On July 15, 2015, Plaintiff reported he experiences major headaches after seizures as well as daily headaches with pain from 5-8/10 and severe headaches

---

[3] Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011) (quoting 20 C.F.R. § 404.1527(a)(2)).

1-2 times a week on right side of head with nausea, photo/ phono sensitivity, treats headaches with Lorazepam and if that does not help then Fioricet and rest in a dark, quiet room (Tr. 739).  On August 17, 2015, Plaintiff reported that since his last visit he had one severe headache originating on his right temporal lobe and with localized pain he characterized as 8/10 with blurred vision and nausea since last visit (Tr. 735).  He took Lorazepam, then three hours later took Fioricet, then 3 hours later took another Fioricet, then headache went away (Tr. 735).  On October 21, 2015, Plaintiff described daily headaches with dizziness, nausea, occasional vomiting, sensitivity to light and sound, right side temporal, parietal, and occipital lobes that usually last 24 hours, sometimes diminished after rest but never gone (Tr. 731).  On December 14, 2015, Plaintiff stated he usually only has headaches after seizures on the right side of his upper head where his injury is and rated the pain as 6-7/10 (Tr. 727).  However, on January 27, 2016, Plaintiff reported having a headache for three weeks rated 6/10 (Tr. 723).  On February 25, 2016, Plaintiff stated he had a headache for three to four weeks, and that if takes Fioricet early enough, it can prevent a migraine (Tr. 715).  On May 1, 2016, Plaintiff indicated he had a headache for two weeks associated with facial numbness, nausea, vomiting, dizziness, blurred vision, occasional photo/ phono sensitivity (Tr. 699).  Dr. Weiss's November 21, 2016, office visit note states that Plaintiff ran out of his seizure medication and experienced headaches due to seizures (Tr. 688).  Plaintiff did not return to Dr. Weiss's office until March 13, 2017 (Tr. 660).  On that date, he again reported an increase in seizures and headaches as a result of difficulty filling his prescription medications (Tr. 660).   Nurse practitioner Meyer

noted that "He states as long as he stay [sic] on his medication he does not have seizures" (Tr. 660).  He also reported tension headaches due to anxiety as well as dizziness with headaches and neck pain, visual disturbances, poor balance, poor memory, and difficulty with word recall (Tr. 660).

Besides his regular treatment notes, Dr. Weiss stated his opinions in a Headache Impairment Questionnaire dated July 15, 2017 (Tr. 751-752).  In it, Dr. Weiss opined that Plaintiff suffers from multiple types of headaches triggered by neck spasms, tension, stress headaches, daily headaches originating in the right temporal and parietal region, and headaches triggered by seizures.  Dr. Weiss characterized Plaintiff's headaches as moderate to severe in intensity and identified vertigo, nausea/vomiting, photosensitivity, and visual disturbances as other symptoms associated with the headaches (Tr. 751-752).  Dr. Weiss opined Plaintiff is "permanently totally disabled due to a traumatic brain injury, seizure disorder, HNPs C5-6 & C6-7, C4-5, Asberger's on the spectrum" (Tr. 751).  Dr. Weiss described Plaintiff's prognosis as "Pt is on the Autism spectrum and [symptoms] are exacerbated since [motor vehicle accident] this contributes to his disability, chronic severe headaches, memory and cognitive impairments, chronic neck pain." (Tr. 751).  Dr. Weiss indicated Plaintiff's symptoms were constantly severe enough to interfere with attention and concentration; emotional factors related to autism spectrum contributed to severity and functional limitations; and that Plaintiff is not capable of performing even a low stress job (Tr. 754-755).  Dr. Weiss opined that during a headache Plaintiff would be precluded from performing even basic work activities and would need a

break from the workplace; he estimated that Plaintiff would be absent more than three times a month due to his headaches (Tr. 755).

Weighing Dr. Weiss's opinions set forth on the Headache Impairment Questionnaire, the ALJ stated:

> As for Dr. Weiss's Headache Impairment Questionnaire (Ex. B12F), the undersigned gives some weight to his statement that he has been able to completely relieve the [claimant's] pain with medication without unacceptable side effects (ExB12F/4), because this is consistent with his records, which document the claimant's statement that "he has been stable with his medications" (B9F/2). Otherwise, the undersigned gives very little weight to the other portions of this questionnaire because they are not supported by the record. More specifically, with respect to the claimant's headaches, they are not consistent with statements in their own records, which indicate that the claimant's headaches have responded to medication.

(Tr. 25). In weighing Dr. Weiss's opinions, the ALJ focused on the fact that just prior to his DLI, on March 13, 2017, Plaintiff reported to Lana Meyer, Dr. Weiss's nurse practitioner, that "as long as he stay [sic] on his medication he does not have seizures" (Tr. 660). The ALJ emphasized that Meyer and Dr. Weiss opined that Plaintiff had "significant memory loss, but their notes show very limited observations on mental status examinations" (Tr. 25). To the ALJ, Meyer and Dr. Weiss's statements that Plaintiff's memory and other cortical functions were grossly intact, that his short-term memory was not impacted, that his MMSE was normal for recall of three items, were "inconsistent with their statements regarding significant memory loss" (Tr. 25-26).

Reviewing Dr. Weiss's extensive treatment notes, however, I cannot find substantial evidence to support the ALJ's conclusions. The ALJ addressed the fact that Plaintiff's seizures and related headaches responded to medication, but neglected

to address that Plaintiff suffers from daily or weekly cluster headaches with accompanying nausea, visual and auditory disturbances, and head pain that are unrelated to his seizure activity.  These significant symptoms are not only noted by Dr. Weiss, but also by providers at Circles of Care and Scott Kaplan, Psy. D. who evaluated Plaintiff on May 31, 2016.  *See* Circles of Care, Tr. 603-611; 628-29; Scott Kaplan, Psy.D., Tr. 643.  Plaintiff's Supplemental Pain Questionnaires dated January 8, 2016, and February 15, 2017, likewise describe chronic headaches that hurt [his] eyes and are very intense" (Tr. 413; 466).  Plaintiff stated his daily headaches that can last for up to two hours several times per day, and that "Fiorocet is effective in pain relief in my head for a few hours. Too long and I will have seizure symptoms." (Tr. 466).

Additionally, I find a lack of support for the ALJ's evaluation of other medical evidence.  In assessing Plaintiff's RFC, the ALJ cited to Plaintiff's mental status exams that "generally failed to reveal any persistent formal thought or psychotic disorder; his treatment has been conservative in nature, consisting primarily of medication management; and he has not sought regular outpatient mental health counseling, nor has he required any hospitalization due to psychiatrically-based symptoms" … consistent with the evaluation of Dr. Weiss (Tr. 24).  The ALJ pointed to Dr. Weiss's mental status exam from May 2016 that "failed to reveal any thought or psychotic disorder, or any signs of paranoia, delusional thinking, or mania; and although intellectual functioning testing did reveal deficiencies in attention, concentration, and memory, the claimant was found to have a normal full scale IQ, including average or

above-average scores in verb al comprehension (116), perceptual reasoning (88), and processing speed (102)" (Tr. 24).  As a result, the ALJ opined that "[o]verall, the claimant's treating records, along with the neuropsychological evaluation, support the conclusion that the claimant is capable of understanding, remembering and carrying out simple and routine tasks, in an environment with only few workplace changes, and no more than occasional interaction with co-workers, supervisors, and the public" (Tr. 24).

Although the medical evidence from Dr. Weiss and Nancy Thompson included "normal" mental status exams, overall, this same evidence revealed a young adult with Asperger's disorder who sustained a traumatic brain injury and thereafter developed an array of neurological and mental health symptoms.  The ALJ did not address this important portion of the evidence.  As in *Simon*, this Court finds that the ALJ mischaracterized Dr. Weiss's medical records.  *See Simon*, 7 F.4th at 1106 ("We conclude that isolated entries in Dr. Turner's treatment notes indicating that Simon was at times stable on his meds, without more, cannot constitute or contribute to good cause to reject Dr. Turner's opinions.").  This error requires remand.  The ALJ erred by concluding that the record shows that Plaintiff's seizures were well-controlled with medication therapy and by failing to address that Plaintiff also suffered from an array of neurological and mental health symptoms related to his traumatic brain injury.

Relatedly, as Plaintiff posits, the ALJ also erred in evaluating the opinions of psychiatric nurse practitioner Joan Anderson who treated Plaintiff at Circles of Care under the supervision of psychiatrist Jose Alvarez, M.D. (Tr. 603).  While a nurse

practitioner was not an "acceptable medical source" pursuant to the regulations applicable to Plaintiff's claim, the ALJ was still required to consider her opinions in determining the severity of a claimant's impairments and how it affects his ability to do work. *See* 20 C.F.R. § 404.1527(f).  In her Mental Impairment Questionnaire, Thompson opined Plaintiff had "marked" limitations in his ability to (1) remember locations and work-like procedures; (2) understand, remember and carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule and consistently be punctual; (5) sustain ordinary routine without supervision; (6) complete a workday without interruptions from psychological symptoms; (7) perform at a consistent pace without rest periods of unreasonable length or frequency; and (8) travel to unfamiliar places or use public transportation (Tr. 673).  Thompson also opined that Plaintiff had "moderate -to-marked" limitations in his ability to (1) understand, remember, and carry out simple, one-to-two step instructions; (2) work in coordination with or near others without being distracted by behavior; (5) respond appropriately to workplace changes; (6) be aware of hazards and take appropriate precautions; (7) set realistic goals; and (8) make plans independently (Tr. 673).

        In considering these opinions, the ALJ stated:

> Very little weight is also given to nurse Thompson's Mental Impairment Questionnaire (Ex.B10F), because under the Regulations, she is not an "acceptable medical source" to give a diagnostic impression (See SSR 06-3p). The undersigned is nevertheless required to give consideration to her opinion regarding the claimant's limitations.  Her opinion is not given much weight. Not only has the claimant never been hospitalized or given inpatient treatment

for the conditions she enumerates, her assessed marked limitations are not supported by or consistent with the record, including her own progress notes.

(Tr. 26).  In considering Thompson's opinions, the ALJ cited to "numerous mental status examinations that showed Plaintiff's memory was consistently found intact for recent and remote events" (Tr. 26 citing ExB6F/6, 8, 9, 10, 11, 13, 15, 16 and 28; B17F).  The ALJ pointed to the last progress note prior to DLI wherein Thompson indicated Plaintiff reported doing much better when he takes his psychotropic medications as prescribed, and that since getting married was doing quite well (Tr. 26). The ALJ discussed that during examination Plaintiff's memory and intellect were unchanged, including intact memory for recent and remote events and intact concentration which was "highly inconsistent" with the "significant memory loss" that Dr. Weiss and nurse practitioner Meyer reported (Tr. 26).

Although the ALJ correctly noted that numerous mental status exams revealed that Plaintiff's memory was intact and that Plaintiff reported doing much better at his final appointment, in the main Thompson's treatment records reveal that Plaintiff displayed a mildly impaired memory for recent and remote events; made no eye contact and looked at the floor or closed his eyes while he speaks; seemed to attempt to decrease stimulation; and displayed autistic type symptomatology or Asperger's type symptoms (Tr. 604-05).  At the outset of treatment in December 2014, Thompson described Plaintiff's chief complaint as mood swings with memory loss, heightened sense of perception, fatigue, proprioception impairment, headaches, and depression, and indicated he had no psychotic symptoms (Tr. 603-04).  Plaintiff reported that he

was experiencing "breakthrough anxiety and depression" with his current medications; that in periods of distress has thrown things and yelled and feels that he could become violent; and that he has difficulty tolerating other people (Tr. 604). Thompson diagnosed Plaintiff with major depressive disorder, recurrent, moderate; Asperger's disorder; obsessive-compulsive personality disorder; psychosocial and environmental problems (Tr. 604).

While follow up visits in January, February, and March 2015, revealed Plaintiff was "doing a little better" as new medications decreased his mood swings, Plaintiff still reported problems with executive functioning, fatigue, and mood problems before seizures (Tr. 606, 608-09, 610).  Unfortunately, Thompson's subsequent records note Plaintiff began experiencing psychosis and hallucinations.  In particular, on May 6, 2015, Plaintiff described "rather bizarre" visual hallucinations (Tr. 614).  Thompson noted Plaintiff "had a mood swing and some self-destructive behaviors recently associated with not getting Social Security disability" and reported "seeing Medusa and her arm coming out of her head periodically" (Tr. 613).  On May 13, 2015, Plaintiff "still feeling quite depressed" (Tr. 618).  Thompson noted: "He had an experience were [sic] he thought he was burning this morning when he woke up.  He is hearing and seeing things.  He is considering a hospital stay" (Tr. 618).  Thompson described Plaintiff as fully alert, oriented, and clear in sensorium; memory intact for recent and remote events; competent to make decisions regarding treatment; makes poor eye contact; very focused on himself; mood seems to press and affect congruent (Tr. 618).  She offered Plaintiff hospitalization, but he declined (Tr. 619).  On May 26,

2015, Thompson indicated his "psychosis seems to be mostly gone" (Tr. 616). However, on June 23, 2015, Plaintiff reported visual distortions that he related to his head injury (Tr. 626).

On January 12, 2016, Thompson noted that Plaintiff reported he was switching from Abilify to Latuda and described an episode during the past week where he became somewhat manic; thought he could fly; and had to be talked down by his friends (Tr. 631).   Thompson noted that Plaintiff "took Risperdal and that helped a great deal" (Tr. 631).   Thompson indicated in her note that despite the mental status changes Plaintiff described associated with his switch from Abilify to Latuda, his affect seemed exactly the same and she noted no changes in mental status (Tr. 631).   On January 20, 2016, Thompson noted that Plaintiff obtained insurance and was able to go back on Abilify and was "doing as good as he has been in a long time" (Tr. 640). Then, on March 8, 2016, Plaintiff returned early for a follow up appointment as he was experiencing breakthrough psychosis with excessive fears, anxiety, and paranoia (Tr. 634).   Thompson noted that Plaintiff had developed more obsessive-compulsive concerns about hygiene and touching objects that others have touched (Tr. 634).

In April 2016, Thompson noted Plaintiff reported more visual hallucinations involving seeing bricks on a building melting or visions of a person who is dead and seeing colors (Tr. 637).   On May 13, 2016, Plaintiff retuned early for a follow up appointment and reported breakthrough psychosis, hearing voices, and suicidal ideations but no intent or plan (Tr. 821).   He reported that last time this occurred Risperdal helped him, but he is out of Risperdal now (Tr. 821).   On August 8, 2016,

Thompson indicated Plaintiff had one episode of paranoia since his last visit.  He became paranoid and thought his medication was poison and that someone was trying to get into his home; his roommates gave him Risperdal and he improved (Tr. 819). On November 30, 2016, Thompson noted that Plaintiff has some breakthrough auditory hallucinations that he is treating PRN with Risperdal and therapy (Tr. 817). On March 6, 2017, Thompson noted that Plaintiff had run out of medication and started having suicidal ideation.  Once back on his medication, Plaintiff improved. Thompson indicated Plaintiff recently got married and was doing "quite well now" (Tr. 815).

Against this backdrop, I find that the ALJ erred in considering Thompson's opinions.  *See* 20 C.F.R. § 404.1527(f).  Despite finding major depressive disorder with psychosis a severe impairment at step two (Tr. 18) and citing to medical evidence documenting Plaintiff's psychosis (Tr. 2), the ALJ failed to discuss Plaintiff's personality disorder, psychosis, paranoia, or difficulty with finding medications that controlled his symptoms when she concluded that Thompson's assessments were "not supported by or consistent with the record, including her own progress notes (Tr. 26). As Plaintiff points out, although the ALJ correctly noted that a nurse practitioner was not considered "an acceptable medical source" under the regulations applicable here, the ALJ failed to consider that Thompson is a psychiatric specialist or her long-term treatment relationship with Plaintiff.  And, when considering Thompson's opinions, by failing to acknowledge Thompson's treatment of Plaintiff's psychosis and hallucinations, and instead focusing on several mental status exams that revealed no

psychosis or abnormalities and a lack of hospitalization and inpatient treatment (Tr. 23, 24, 26), the ALJ mischaracterized the record.

As Plaintiff indicates, Thompson's treatment records reveal his depressed mood, persistent or generalized anxiety, feelings of guilt or worthlessness, autistic thought process, illogical thought process, suicidal ideation, paranoia, difficulty thinking or concentrating, poor immediate, recent, and remote memory, intrusive recollections of a traumatic experience, paranoia/ suspiciousness, recurrent panic attacks, anhedonia/ pervasive loss of interests, change in personality, pathological dependence, passivity, aggressiveness, psychomotor agitation, social withdrawal or isolation, delusions, visual hallucinations, and other perceptual or reality disturbances (Tr. 671, 675).  As a result, I cannot conclude that the ALJ's decision is based on substantial evidence as it focuses on aspects of the evidence— that Plaintiff's headaches subsided when his seizures were controlled with medication and that his mental status exams were "normal"— while disregarding contrary evidence— that Plaintiff continued to suffer from headaches unrelated to seizure activity and an array of symptoms related to his traumatic brain injury as well as his other impairments.  *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).

Although the Commissioner correctly notes that the ALJ does not have to refer to every piece of evidence, considering Plaintiff's neurological and mental health treatment history and the regulations, the Court cannot conclude that substantial evidence supports the ALJ's decision.  While the ALJ need not refer to each and every treatment note, the ALJ must demonstrate that she considered Plaintiff's medical

condition as a whole.  *See Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1326 (11th Cir. 2021) (ALJ need not cite every piece of evidence in the record" but must demonstrate he "considered the claimant's medical condition as a whole"); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (ALJ not required to specifically address every piece of evidence in the record).  Here, aside from the ALJ's reference to a few mental status exams where Plaintiff appeared "normal," any discussion of Plaintiff's difficulty maintaining mental stability and to his repeated episodes of psychosis are conspicuously missing from the ALJ's sparse summary of the medical evidence.  Aside from a discussion of seizures and seizure-related headaches, also absent from the decision is a discussion of the neurological symptoms related to Plaintiff's traumatic brain injury (such as cluster headaches and head pain, memory loss, mood swings, and fatigue).  As in *Simon*, the ALJ's references to office visit notes reflecting Plaintiff's mood as "euthymic," his memory as "intact," and his mini mental status exams as "normal," although true, hardly establish that Plaintiff does not suffer from debilitating mental illness.  *Simon*, 7 F.4th at 1106.  Like the claimant in *Simon*, the Plaintiff's diagnosis caused Plaintiff to experience more serious symptoms than those acknowledged by the ALJ.

In remanding this case, I point out that an ALJ must consider "the fundamental differences between the relaxed, controlled setting of a medical clinic and the more stressful environment of the workplace."  *Simon*, 7 F.4th at 1107 (quoting *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)) ("for a person who suffers from an affective disorder or personality disorder marked by anxiety, the work environment is

completely different from home or a mental health clinic"); *see also Schink*, 935 F.3d at 1263 ("it is not inconsistent – or even that unlikely … that a patient with a highly disruptive mood disorder, in a structured one-on-one conversation with a mental health professional, might be capable of 'be[ing] redirected' from his 'tangential' thought processes so as to 'remain on topic.'"); *Castro v. Comm'r of Soc. Sec.*, 783 F.App'x 948, 956 (11th Cir. 2019) ("Without more, we cannot say that [the treating physician's] observations of Castro's judgment, insight, thought process, and thought content in a treatment environment absent work stressors were inconsistent with his assessments about the limitations she would face in a day-to-day work environment"). Although *Simon* involved a claimant diagnosed with bipolar disorder, Plaintiff's mental health diagnosis of major depressive disorder with psychosis is a chronic condition too.   Chronic mental disorders are characterized by "unpredictable fluctuation of their symptoms, and thus it is not surprising that even a highly unstable patient will have good days or possibly good months." *Id*. (quoting *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)).   For those who suffer from chronic disorders, "'a snapshot of any single moment says little about [a person's] overall condition,' and an ALJ who relies on such snapshots to discredit the remainder of a psychiatrist's findings demonstrates a 'fundamental, but regrettably all-too-common, misunderstanding of mental illness.'" *Id*. (quoting *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)).   Like the claimant in *Simon*, the Plaintiff's diagnosis caused Plaintiff to experience more serious symptoms than those acknowledged by the ALJ.

   *B.  Remaining Issues*

Considering the remand, it is unnecessary to address the remaining issue (the ALJ's consideration of Plaintiff's subjective complaints).

   *IV.   Conclusion*

It is ORDERED:

   (1) The ALJ's decision is REVERSED and REMANDED to the Commissioner for further administrative proceedings consistent with this Order; and

   (2) The Clerk of Court is directed to enter judgment for Plaintiff and close the case.

DONE and ORDERED in Tampa, Florida on January 18, 2023.

_____
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


cc:    Counsel of Record